**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | Bankruptcy No. 21 B 03680 |
| | ) | |
| AMIT GAURI, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | Honorable Janet S. Baer |
| | ) | |
| | ) | |
| PARENT PETROLEUM, INC., | ) | Adversary No. 21 A 00106 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| AMIT GAURI, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OPINION**

Parent Petroleum, Inc. ("Parent") filed a six-count adversary complaint against Amit Gauri ("Gauri"), seeking both a determination that a debt owed to Parent by Gauri is not dischargeable pursuant to 11 U.S.C. § 523(a)(2)(B) and denial of Gauri's discharge pursuant to 11 U.S.C. §§ 727(a)(2), (a)(3), (a)(4)(A), (a)(5), (a)(6), and (a)(7).[1] The matter is now before the Court on Parent's motion for partial summary judgment on the claims under §§ 727(a)(2), (a)(3), (a)(4)(A), (a)(6), and (a)(7) in Counts 1 through 4 of its complaint. For the reasons set forth below, the Court finds that there are no genuine issues of material fact and that Parent is entitled to judgment as a matter of law on Counts 1 through 3. As such, Parent's motion will be granted, and judgment will be entered in Parent's favor on those counts. Summary judgment will be denied as to Count 4.

---

[1] Unless otherwise noted, all statutory and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101 to 1532, and the Federal Rules of Bankruptcy Procedure, respectively.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. This is a core proceeding under 28 U.S.C. § 157(b)(2)(J).

## BACKGROUND[2]

Gauri filed a petition for individual relief under chapter 11 on March 22, 2021. The history of this dispute, however, can be traced back much further and is substantially intertwined with Gauri's now-defunct company Black Dog Chicago, LLC ("BD Chicago"), which Gauri caused to file its own chapter 11 petition on October 4, 2019. Parent's complaint alleges, among other things, that Gauri, primarily through acts committed in the BD Chicago case, should be denied discharge in his individual case under § 727(a)(7) of the Bankruptcy Code. That statute extends the basis for denial of discharge to a debtor's wrongdoing in a related case.

BD Chicago was a holding company that was generating roughly $2 million in annual income as of 2019. (BD Chicago Dkt. 194 at 13.) Gauri was BD Chicago's sole manager and owned 80.01% of the company through Black Dog Commercial Ventures, Corp., which Gauri owned outright. (Adv. Dkt. 16 ¶¶ 1–4.) Gauri's signature appears on BD Chicago's filings, including its bankruptcy schedules and statement of financial affairs. (*Id.* ¶ 15.) Gauri created BD Chicago on October 4, 2017; on January 1, 2018, he merged Black Dog Chicago Corp. ("BD Corp"), an entity that had been operating since 2006, into BD Chicago. (*Id.* ¶¶ 5, 9; Adv. Dkt. 7 ¶ 9.) BD Chicago wholly owned three subsidiary companies, also created by Gauri—Black Dog

---

[2] Unless otherwise noted, all docket citations in this Memorandum Opinion to the "Bankr. Dkt." refer to Gauri's personal bankruptcy case (Bankr. No. 21 B 03680), all citations to the "BD Chicago Dkt." refer to Black Dog Chicago's bankruptcy case (Bankr. No. 19 B 28245), and all citations to the "Adv. Dkt." refer to the above-captioned adversary proceeding (Adv. No. 21 A 00106).

Petroleum LLC ("BD Petroleum"), Black Dog Foods LLC ("BD Foods"), and Black Dog Solutions LLC ("BD Solutions") (collectively, the "Operating Subsidiaries"). (Adv. Dkt. 16 ¶¶ 6–8, 10.) The Operating Subsidiaries generated nearly all of BD Chicago's gross revenue and paid Gauri's salary. (BD Chicago Dkt. 40 at 1; Adv. Dkt. 47 ¶¶ 3–7.) After its petition was filed, BD Chicago was initially permitted to continue its operations as a debtor in possession without the appointment of a trustee. At that time, BD Chicago and its Operating Subsidiaries had approximately forty employees. (BD Chicago Dkt. 343 ¶ 5.)

Parent specializes in petroleum product sales and provided fuel and lubricant products to BD Chicago and BD Corp. (Adv. Dkt. 7 ¶ 11.) Parent is the largest unsecured creditor in Gauri's individual case, holding a judgment against him in the amount of $2.8 million. (Tr. at 4:22–24.[3]) BD Chicago's bankruptcy was filed after partial summary judgment was granted in Parent's favor against BD Chicago and Gauri in state court in June of 2019 in the amount of $2.5 million. (*Id.* at 10:16–23.)

**The Southwind Factoring Agreement**

On or about January 1, 2018, BD Petroleum entered into a factoring agreement with Southwind Industries Inc. ("Southwind"). (Adv. Dkt. 48 ¶ 30.) Pursuant to this agreement, Southwind purports to hold a multi-million-dollar lien against all assets of BD Petroleum. (Adv. Dkt. 16 ¶ 84, Ex. 14 ¶ 5.1.) On December 4, 2019, BD Chicago, through Gauri, filed a report of financial information on "Entities in Which the [Chapter 11] Estate Holds a Substantial or Controlling Interest" pursuant to Rule 2015.3 (the "2015.3 Report"). (*Id.* ¶ 87, Ex. 15.) The report certifies that the information provided is "complete, accurate and truthful to the best of [the undersigned's] knowledge." (*Id.*; Adv. Dkt. 48 ¶ 33.) No mention of the Southwind factoring

---

[3] Unless otherwise noted, transcript references are to the Court's oral ruling on October 12, 2022, which can be found at Bankr. Dkt. 285.

3

agreement was contained in the 2015.3 Report, and it was not disclosed anywhere else on the BD Chicago docket. (Adv. Dkt. 48 ¶ 32.)

### PPP & EIDL Loans

In early 2020, the U.S. Small Business Administration (the "SBA") introduced two loan programs to assist businesses impacted by the coronavirus pandemic—the Paycheck Protection Program ("PPP") and Economic Injury Disaster Loans ("EIDL"). On April 9, 2020, while BD Chicago's chapter 11 case was pending, PNC Financial Services Group ("PNC Financial"), one of BD Chicago's lenders, denied a PPP loan application that Gauri had submitted in which he had falsely claimed that BD Chicago was not in bankruptcy. (Adv. Dkt. 48 ¶ 34.) Aware that this was untrue, PNC Financial's vice president told Gauri that both BD Chicago and its subsidiary companies were ineligible for PPP funds because of BD Chicago's pending bankruptcy. (*Id.* ¶¶ 34, 37.) Subsequently, between April and June of 2020, Gauri submitted three PPP loan applications on behalf of the Operating Subsidiaries—BD Petroleum, BD Foods, and BD Solutions. (Adv. Dkt. 16 ¶¶ 25–50.) The applications for BD Petroleum and BD Foods were filed with First Midwest Bank. (*Id.* ¶¶ 41, 50.) The BD Solutions application was filed with WebBank. (*Id.* ¶ 32.) All three applications contained language asking if the "Applicant or any owner of the Applicant" was "presently involved in any bankruptcy" (*id.* ¶¶ 27, 36, 45), informing applicants that applications would not be approved if they responded to the question affirmatively (*id.* ¶¶ 26, 35, 44), and certifying the applications' truth and accuracy under penalty of law (*id.* ¶¶ 31, 40, 49). Gauri untruthfully responded "no" on all three applications and was approved for all three PPP loans in the total amount of $407,130. (*Id.* ¶¶ 28, 32, 37, 41, 46, 50.) Gauri did not seek court authorization prior to applying for any of the loans.

In June of 2020, Gauri submitted a fourth loan application directly to the SBA, this time seeking an EIDL loan of $150,000 on behalf of BD Chicago. (*Id.* ¶ 56.) The EIDL loan application contained Gauri's certifications that there had been "no substantial adverse change in Borrower's financial condition" and that the information provided was "true, correct and complete." (*Id.* ¶ 60, Ex. 10 at 5–6.) Gauri again answered the questions related to bankruptcy untruthfully and signed an affirmation of these certifications. (Adv. Dkt. 16 ¶ 61, Ex. 10 at 7.) Gauri claims that he originally sought this loan on behalf of BD Petroleum but that he was told by someone at the SBA that the application had to be filed on behalf of the company's tax reporting entity, BD Chicago. (Adv. Dkt. 47 ¶ 19.) In connection with the EIDL loan, Gauri also executed a security agreement on behalf of BD Chicago which gave the SBA a security interest in "all tangible and intangible personal property" of BD Chicago. (Adv. Dkt. 16, Ex. 10 at 2, 16–17 ¶ 4.) Gauri did not seek the Court's approval before obtaining this loan either. (Adv. Dkt. 16 ¶ 63.) On June 16, 2020, pursuant to Gauri's instructions, the SBA wired $149,900 to an account held in BD Petroleum's name. (*Id.* ¶ 72.)

Also on June 16, 2020, Gauri caused BD Petroleum to transfer $50,000 from the same account to an account held by AGPD Paving, a company in which Gauri holds a controlling 55% interest. (*Id.* ¶¶ 74–76.) Then, in two transactions on June 19, 2020 and June 23, 2020, Gauri caused BD Petroleum to transfer $120,000 to Southwind, also from the same BD Petroleum account. (*Id.* ¶¶ 77–78.) On July 21, 2020, Gauri signed BD Chicago's June Monthly Operating Report (the "June 2020 Monthly Operating Report") and caused it to be filed in BD Chicago's bankruptcy case. (*Id.* ¶ 69.) On August 3, 2020, Gauri signed BD Chicago's third amended disclosure statement and caused it to be filed as well. (*Id.* ¶ 51.) No mention of the PPP or EIDL

loans or the resulting proceeds was included in either filing. (*Id.* ¶¶ 53–55, 67, 71; *see also id.*, Ex. 12.)

The Court became aware of the PPP and EIDL loans when the U.S. Trustee reported that an SBA representative had reached out on September 21, 2020 to inform the Trustee about the loans. (BD Chicago Dkt. 374 ¶ 9.) Shortly thereafter, on October 6, 2020, the Court entered an order approving the appointment of a chapter 11 trustee for the BD Chicago case. (*Id.* ¶ 12.)

**Case Management Procedures, Gauri's Chapter 11 Petition,
and Conversion of Cases to Chapter 7**

On October 21, 2020, the Court entered an order in the BD Chicago case pursuant to the newly appointed trustee's motion, approving case management procedures both to allow for structured payments to PNC Bank, N.A. ("PNC") and Heritage FS, Inc. ("Heritage"), secured creditors with pre-petition liens on "all personal property of the Black Dog Companies," and to permit the trustee to better administer the BD Chicago estate in relation to the Operating Subsidiaries. (BD Chicago Dkt. 343 ¶¶ 7, 11, 18; BD Chicago Dkt. 347.) The order put procedures in place (the "Case Management Procedures") which bound the Operating Subsidiaries to heightened reporting requirements and to limits on their authority to make payments or incur new debt. (BD Chicago Dkt. 347 ¶¶ 2(a), (e), (f).) More specifically, apart from payments to PNC and Heritage, the Case Management Procedures order limited payments of the Operating Subsidiaries solely to those "made on account of ordinary course of business trade payables necessary to the continuing operations of their businesses" and barred "payments, distributions or transfers of any kind to Amit Gauri, any relatives or affiliates of Amit Gauri or any owners of [BD Chicago]." (*Id.* ¶ 2(e).) Nevertheless, on March 22, 2021, Gauri caused BD Petroleum to pay $21,717 to the

attorneys representing him in his individual bankruptcy case.[4] (Adv. Dkt. 16 ¶ 81.) Further, the Operating Subsidiaries made salary payments to Gauri after entry of the Case Management Procedures order without receiving written approval from the trustee. (Adv. Dkt. 47 ¶¶ 3, 6.)

Also on March 22, 2021, Gauri filed his individual chapter 11 case. About three months later, on June 28, 2021, Parent filed this adversary proceeding in Gauri's case. (Adv. Dkt. 1.) On August 4, 2021, after a report from an independent firm revealed inadequate financial recordkeeping and little chance for a successful reorganization, BD Chicago's case was converted to chapter 7 on the chapter 11 trustee's motion. (BD Chicago Dkt. 437; BD Chicago Dkt. 374 ¶¶ 16–17.) Thereafter, the automatic stay was modified to allow BD Chicago's secured lenders, PNC and Heritage, to foreclose on the company's assets. (Tr. at 13:3–14.) Those assets consisted primarily of the membership interests in the Operating Subsidiaries. (*Id.*) In disclosures filed with the Court, Gauri represented that his father had purchased the membership interests at a UCC sale and subsequently transferred the interests to Gauri. (Tr. at 15:18–24; Bankr. Dkt. 140 at 17.) However, in filings made with the City of Chicago for purposes of attempting to preserve or reinstate the Minority Business Enterprise status of the Operating Subsidiaries, Gauri stated that he had borrowed the funds from his father and then purchased the interests at the UCC sale himself. (Tr. 15:25–16:5.)

On October 12, 2022, citing Gauri's "numerous misrepresentations," the Court denied confirmation of Gauri's proposed individual chapter 11 plan for bad faith and failure to prove feasibility. (*Id.* at 26:23–27:12, 31:10–22.) On November 16, 2022, Gauri's individual case was converted to chapter 7.

---

[4] That payment was voluntarily restored to BD Petroleum after the U.S. Trustee voiced concerns, although the restored funds came from AGPD Paving. (Adv. Dkt. 49-1 ¶ 36.)

On March 13, 2023, Parent filed the instant motion for partial summary judgment on Counts 1 through 4 of its complaint. (Adv. Dkt. 44.) That motion has been fully brief and is now ready for ruling.

### SUMMARY JUDGMENT

Summary judgment is appropriate when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) (made applicable to adversary proceedings by Fed. R. Bankr. P. 7056). The primary purpose of the summary judgment procedure is to avoid unnecessary trials where no material facts are in dispute. *See Trautvetter v. Quick*, 916 F.2d 1140, 1147 (7th Cir. 1990); *Farries v. Stanadyne/Chi. Div.*, 832 F.2d 374, 378 (7th Cir. 1987). Thus, on a motion for summary judgment, the court must decide, based on the evidence, whether there is a material disputed fact that requires a trial. *Gupta v. Melloh*, 19 F.4th 990, 996–97 (7th Cir. 2021). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where the material facts are not in dispute, the only issue is whether the moving party is entitled to judgment as a matter of law. *ANR Advance Transp. Co. v. Int'l Brotherhood of Teamsters, Loc. 710*, 153 F.3d 774, 777 (7th Cir. 1998).

### Standards

The party seeking summary judgment always bears the burden of establishing that there are no genuine issues of material fact in dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In determining whether the movant has met its burden, the court must view all reasonable inferences drawn from the underlying facts in a light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 248; *Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 928 (7th Cir. 2020). Once the moving party satisfies its initial burden of production, the party opposing the motion may

not rest on the mere allegations or denials in his pleadings; rather, his response must set forth specific facts demonstrating that there is a genuine issue for trial. *See Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 248; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001).

All factual assertions made in a summary judgment motion must be supported by citations to particular parts of material in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, and other materials. Fed. R. Civ. P. 56(c)(1)(A); L.R. 7056-1(B). Likewise, a party asserting that a fact is genuinely disputed must support that assertion with citations to the record. Fed. R. Civ. P. 56(c)(1)(A); L.R. 7056-2(A)(2)(a); *Ortega v. United States*, No. 16-cv-8402, 2021 WL 4477896, at \*2 (N.D. Ill. Sept. 30, 2021). Facts that are denied without evidentiary support for the denials are deemed admitted. L.R. 7056-2(B) ("All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party."); *Maxwell v. Penn Media (In re marchFirst, Inc.)*, Bankr. No. 01 B 24742, Adv. No. 03 A 1141, 2010 WL 4027723, at \*2 (Bankr. N.D. Ill. Oct. 14, 2010); *see also Williams v. City of Chi. Bd. of Educ.,* No. 10 C 7105, 2012 WL 3023313, at \*4 (N.D. Ill. July 24, 2012) ("[T]o the extent that any of [a party's] denials do not contain a citation to the record or the citation does not support the denial, those statements of fact . . . [are] deemed admitted.").

As discussed *infra*, all material facts in this matter are either admitted or deemed admitted. As such, the sole determination to be made is whether Parent is entitled to judgment as a matter of law.

## DISCUSSION

In its motion for summary judgment, Parent seeks judgment as a matter of law on Counts 1 through 4 of its adversary complaint pursuant to §§ 727(a)(2), (a)(3), (a)(4)(A), (a)(6), and (a)(7). All four of those counts include claims brought under § 727(a)(7). Thus, at the outset, the Court addresses that statutory provision.

### 1.  Section 727(a)(7)

Parent alleges in its complaint that Gauri, primarily through acts committed in the BD Chicago case, should be denied discharge in his individual case under § 727(a)(7) of the Bankruptcy Code. Unlike the other subsections of § 727(a), subsection (a)(7) does not provide an independent basis to deny a debtor's discharge. Rather, it extends the basis for denial of a discharge to the debtor's wrongdoing in related cases. *In re Krehl*, 86 F.3d 737, 741 (7th Cir. 1996). Challenges to discharge typically involve acts performed during the case at hand, but subsection (a)(7) provides for the denial of a debtor's discharge if "the debtor has committed any act specified in paragraph (2), (3), (4), (5), or (6) of this subsection, on or within one year before the date of the filing of the petition, or during the case, *in connection with another case*, under this title . . . , concerning an insider." 11 U.S.C. § 727(a)(7) (emphasis added). In order to prevail under § 727(a)(7), a plaintiff must demonstrate that: (1) the elements of a cause of action under paragraph (2), (3), (4), (5), or (6) of § 727(a) are satisfied; (2) the acts at issue took place during the current case or within one year before the filing of the petition; and (3) those acts occurred in connection with the bankruptcy case of an insider. *See Krehl*, 86 F.3d at 741.

10

For individual debtors, the Bankruptcy Code defines "insider" to include a "corporation of which the debtor is a director, officer, or person in control." 11 U.S.C. § 101(31)(A). *See also* 11 U.S.C. § 101(9)(A)(4) (defining a "corporation" to include unincorporated limited liability companies); *Sherron Assocs. Loan Fund XXI (Lacey) L.L.C. v. Thomas (In re Parks)*, 503 B.R. 820, 829 (Bankr. W.D. Wash. 2013) (holding that "L.L.C.s fall within the 'corporation' definition of § 101(9)"). When a debtor is a corporation, its insiders include any "person in control of the debtor." 11 U.S.C. § 101(31)(B). Here, Gauri admits that he was an insider of BD Chicago (Adv. Dkt. 48 ¶ 19), and all of Parent's material allegations are undeniably connected to Gauri's and/or BD Chicago's bankruptcy cases. Hence, for the remainder of this analysis, § 727(a)(7) will be satisfied if Parent establishes the elements of a separate § 727(a) cause of action and shows that the acts at issue took place within one year prior to the filing of Gauri's individual case—March 22, 2020 or thereafter.

### 2.  Section 727(a)(4)(A)

In Count 2 of its complaint, Parent objects to Gauri's discharge under § 727(a)(4)(A). That statutory provision enforces a debtor's "paramount and absolute" obligation to provide full and accurate information about himself and his affairs, *Urological Grp., Ltd. v. Petersen (In re Petersen)*, 296 B.R. 766, 790 (Bankr. C.D. Ill. 2003), by denying a discharge to any debtor who has "knowingly and fraudulently, in or in connection with the case[,] . . . made a false oath or account," 11 U.S.C. § 727(a)(4)(A). Indeed, to get a "fresh start" under the Bankruptcy Code, a debtor must "accurately and truthfully present [himself] before the [c]ourt." *Stathopoulos v. Bostrom (In re Bostrom)*, 286 B.R. 352, 359 (Bankr. N.D. Ill. 2002), *aff'd*, 2003 WL 403138 (N.D. Ill. Feb. 20, 2003). "All assets and ownership interests must be disclosed, and all questions in the schedules and statement of financial affairs must be answered completely and honestly." *Schechter*

11

*v. Hansen (In re Hansen)*, 325 B.R. 746, 757 (Bankr. N.D. Ill. 2005). The trustee and creditors are entitled to information that will permit them to evaluate the case. *Clean Cut Tree Serv., Inc. v. Costello (In re Costello)*, 299 B.R. 882, 899 (Bankr. N.D. Ill. 2003). "The very integrity of the bankruptcy court and the successful administration of the bankruptcy system rest upon compliance with the debtor's obligation of disclosure." *Petersen*, 296 B.R. at 790.

Parent groups Gauri's alleged violations of § 727(a)(4)(A) into three specific acts. First, Parent claims that Gauri falsely attested on the PPP and EIDL loan applications that BD Chicago was not in bankruptcy. Second, Parent contends that Gauri falsely attested on the EIDL loan application that BD Chicago was authorized to receive the loan and that BD Chicago would not transfer the proceeds to any owner, partner, employee, affiliate, or other company without the written consent of the SBA. Finally, Parent alleges that Gauri falsely attested in the June 2020 Monthly Operating Report that BD Chicago had neither received nor transferred the EIDL proceeds. In response, Gauri says that the transactions at issue were recorded in the books and records of the Operating Subsidiaries, that those transactions did not materially relate to the BD Chicago bankruptcy estate, and that the transactions actually benefited the creditors of the Operating Subsidiaries, thus invalidating any claim that Gauri had fraudulent intent.

To prevail under § 727(a)(4)(A), Parent must establish that: (1) Gauri made a statement under oath; (2) the statement was material to the bankruptcy case; (3) the statement was false; (4) Gauri knew that the statement was false; and (5) the statement was made with an intent to deceive. *See Stamat v. Neary*, 635 F.3d 974, 978 (7th Cir. 2011); *Hansen*, 325 B.R. at 758.

The first, third, and fourth factors are not in dispute. Gauri's statements and omissions in the PPP and EIDL loan applications and the June 2020 Monthly Operating Report were made under oath. He signed each document pursuant to sworn affirmations of veracity and completeness.

12

The statements and omissions were also false. BD Chicago was in bankruptcy when Gauri submitted the PPP and EIDL loan applications, and the funds from the loans had been received and disbursed despite their omission from the June 2020 Monthly Operating Report. Although Gauri contends that the information about these transactions was disclosed elsewhere, the affidavits to which he cites in support of this claim make no reference to any disclosure on the docket. Nor does Gauri explain where or how the Court or BD Chicago's creditors could have accessed the "books and records" in which these alleged disclosures were made. (Adv. Dkt. 47 ¶ 12; Adv. Dkt. 48 ¶ 59; Adv. Dkt. 49-1 ¶ 17; *see also* Adv. Dkt. 49-2 ¶¶ 7–10.) Finally, Gauri had to have known that his statements and omissions in connection with the loans were false. As the signatory on each related document, Gauri knew that BD Chicago was in bankruptcy and that he had taken out the PPP and EIDL loans. Gauri's remaining defenses challenge the second and fifth elements under this analysis—materiality and intent.

### A. Materiality

"[A] fact is material 'if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property." *Stamat*, 635 F.3d at 982 (quoting *Retz v. Samson (In re Retz)*, 606 F.3d 1189, 1198 (9th Cir. 2010)). Thus, Gauri's statements and omissions are material if they bear a relationship to the administration of BD Chicago's estate. Based on the evidence of record here, such a relationship exists.

Gauri correctly states that the assets of the Operating Subsidiaries were not property of the estate. In fact, BD Chicago was merely a holding company that generated no revenue apart from its Operating Subsidiaries. Nevertheless, the administration of BD Chicago's estate required accurate financial reporting of the Operating Subsidiaries. Such information is material to the

estate. Any other conclusion would give a debtor carte blanche to conceal its financial information behind a thinly veiled corporate shell. "The threshold for materiality is low[,]" *Layng v. Garcia (In re Garcia)*, 586 B.R. 909, 918 (Bankr. N.D. Ill. 2018), and each of the aforementioned statements and omissions meets its requirements. This is especially true as to those statements and omissions related to the EIDL loan and its proceeds because BD Chicago was a direct party to that transaction.

Gauri argues otherwise. He claims that BD Petroleum retained the true beneficial interest under the EIDL loan and that BD Chicago was acting only as BD Petroleum's nominee. Thus, Gauri says, BD Chicago had no direct interest in the EIDL loan, and any false oaths made in connection with that loan were immaterial. This argument is without merit. First, BD Chicago was not a mere nominee. Rather, BD Chicago owned BD Petroleum at all times relevant to the EIDL loan transaction, and any beneficial interest conferred on BD Petroleum would likewise be conferred on BD Chicago. In addition, BD Chicago's assets—not BD Petroleum's—were pledged as collateral for the EIDL loan. *See Paloian v. Dordevic (In re Dordevic)*, 67 F.4th 372, 382 (7th Cir. 2023) (discussing the test for "nominee" status in the Seventh Circuit). Second, even if BD Chicago were a nominee, that designation would mean only that BD Petroleum's creditors would have to seek disgorgement of the EIDL proceeds from BD Chicago when pursuing collection against BD Petroleum. Nothing suggests that BD Chicago would be any more protected from its creditors or excused from the Court's disclosure requirements as a nominee than it would be as a true party in interest to the EIDL loan. *See generally United States v. Calabrese*, No. 02 CR 1050-4, 2013 WL 4537248, at *2–4 (N.D. Ill. Aug. 27, 2013); *see also Dordevic*, 67 F.4th at 380–87; *Oxford Cap. Corp. v. United States*, 211 F.3d 280, 284 (5th Cir. 2000). Based on the foregoing,

14

Gauri's argument fails, and the Court finds that his statements and omissions related to the PPP and EIDL loans are material to BD Chicago's case.

### B. Intent to Deceive

It is well established that for a debtor to have the intent to bar his discharge under § 727(a)(4)(A), he must have either knowingly intended to defraud or "engaged in such reckless behavior as to justify the finding of fraud." *In re Yonikus*, 974 F.2d 901, 905 (7th Cir. 1992) (discussing the intent requirement in the context of discharge revocation). Sometimes described as "reckless indifference," *see, e.g., Neugebauer v. Senese (In re Senese)*, 245 B.R. 565, 575 (Bankr. N.D. Ill. 2000), reckless disregard is "the state of mind present when a debtor does not care about the truth or falsity" of a statement or omission. *Neary v. Stamat (In re Stamat),* 395 B.R. 59, 71 (Bankr. N.D. Ill. 2008), *aff'd,* 2009 WL 2916834 (N.D. Ill. Sept. 2, 2009), *aff'd*, 635 F.3d 974 (7th Cir. 2011). Alternatively, "the requisite intent under § 727(a)(4)(A) may be inferred from circumstantial evidence or by inference based on a course of conduct." *Baccala Realty, Inc. v. Fink (In re Fink)*, 351 B.R. 511, 527 (Bankr. N.D. Ill. 2006); *see also Richardson v. Clarke (In re Clarke)*, 332 B.R. 865, 870 (Bankr. C.D. Ill. 2005) (explaining that, in deciding whether a debtor has acted with intent to defraud for purposes of § 727, court should consider the debtor's "'whole pattern of conduct'").

In this matter, the Court finds that Gauri made the false statements and omissions at issue knowingly and with an intent to deceive. Just a few weeks before applying for the PPP loans from WebBank and First Midwest Bank, Gauri was denied PPP funding from PNC Financial. In the PNC Financial loan application, Gauri falsely claimed that BD Chicago was not in bankruptcy. Knowing that this was false, the vice president of PNC Financial emailed Gauri to tell him that "the company [was] ineligible for the program" due to its pending bankruptcy. (Adv. Dkt. 48

15

¶ 34.) In response, Gauri requested the link to PNC Financial's PPP loan application so that he could submit applications on behalf of the Operating Subsidiaries instead. (*Id.* at ¶ 36.) The vice president informed him, however, that "as BD Chicago [was] in bankruptcy, its subsidiary companies would be ineligible for PPP funds." (*Id.* ¶ 37.) A short time later, Gauri then went to different lenders—WebBank and First Midwest Bank—and submitted PPP loan applications for the Operating Subsidiaries, again falsely attesting that no parent company was in bankruptcy. At that time, he was, at minimum, on notice that the Operating Subsidiaries were ineligible for the program. Despite that, Gauri carried on, displaying precisely the act-now-apologize-later reckless disregard for the truth required to deny discharge under § 727(a)(4)(A). *See In re Chavin*, 150 F.3d at 726, 728 (7th Cir. 1998).

Gauri offers three principal arguments to support his claim that he did not have the requisite intent under § 727(a)(4)(A).  All are baseless and unconvincing.

First, Gauri says, he did not act with fraudulent intent because "all the transactions and related transfers benefited creditors of the Operating Subsidiaries." (Adv. Dkt. 47 ¶ 8.) This argument is off the mark. That creditors of the Operating Subsidiaries benefited in any way from the transactions neither supports nor negates the contention that Gauri intended to deceive BD Chicago's creditors. Moreover, the Court notes that the Operating Subsidiaries were paying Gauri's generous salary when he applied for the PPP loans. Thus, Gauri himself was one of the primary beneficiaries of the loans.

Second, Gauri asserts that "most contemporary observers" believed that the bankruptcy exclusion for PPP loans was "arbitrary and capricious and violative of Section 525(a)." (Adv. Dkt. 47 ¶ 16.) Notwithstanding the validity of the bankruptcy exclusion, the proper remedy was not to

16

lie on PPP applications after receiving an unambiguous rejection. In doing so, Gauri acted knowingly and in reckless disregard of the truth.

Finally, Gauri argues that summary judgment is inappropriate in actions requiring a finding of fraudulent intent. (Adv. Dkt. 47 ¶ 1.) Indeed, summary judgment should be "used sparingly and with great caution in cases such as this one where subjective intent is a factor in the determination." *See Alexander v. Erie Ins. Exch.*, 982 F.2d 1153, 1160 (7th Cir. 1993). However, "[a] denial of knowledge may be so utterly implausible in light of conceded or irrefutable evidence that no rational person could believe it; and if so, there is no occasion to submit the issue of knowledge to determination at trial." *Chavin*, 150 F.3d at 728. Here, the objective evidence contradicts Gauri's version of the events, and his story is so "internally inconsistent or implausible on its face that a reasonable factfinder would not credit it." *See id.*

In sum, Parent has established all of the elements required under § 727(a)(4)(A). Accordingly, Gauri is not entitled to a discharge under that statutory provision, and his discharge will be denied.

### 3. Section 727(a)(2)

In Count 3 of its complaint, Parent objects to Gauri's discharge under § 727(a)(2). A debtor's discharge may be denied under § 727(a)(2) when the debtor, "with intent to hinder, delay, or defraud a creditor . . . , has transferred, removed, destroyed, mutilated, or concealed— (A) property of the debtor, within one year before the date of the filing of the petition; or (B) property of the estate, after the date of the filing of the petition." 11 U.S.C. § 727(a)(2).[5] The

---

[5] Apart from timing, there is no difference between an analysis under § 727(a)(2)(A) and an analysis under § 727(a)(2)(B). Because § 727(a)(7) obviates the need to distinguish based on timing, no distinction will be drawn between the two subsections in the analysis going forward. *See Grochocinski v. Campbell (In re Campbell)*, 475 B.R. 622, 636 (Bankr. N.D. Ill. 2012) (explaining that "[t]he elements under § 727(a)(2)(B) are substantially the same as those under § 727(a)(2)(A)" (internal quotations omitted)).

17

purpose of the statutory provision is to prevent the discharge of a debtor who attempts to avoid paying his creditors by concealing or otherwise disposing of his assets. *Layng v. Hicks (In re Hicks),* Bankr. No. 15 B 26479, Adv. No. 16 A 00320, 2017 WL 1160871, at *12 (Bankr. N.D. Ill. Mar. 24, 2017). "In order to justify the [denial] of discharge under a section 727(a)(2) transfer, it must be shown that there was an actual transfer of valuable property belonging to the debtor which reduced the assets available to creditor[s] and which was made with fraudulent intent." *Lee Supply Corp. v. Agnew (In re Agnew)*, 818 F.2d 1284, 1289 (7th Cir. 1987) (internal quotations omitted). Thus, to prevail under § 727(a)(2), Parent must establish two elements: "an act (i.e., a transfer or a concealment of property) and an improper intent (i.e., a subjective intent to hinder, delay, or defraud a creditor)." *See In re Kontrick*, 295 F.3d 724, 736 (7th Cir. 2002), *aff'd on other grounds sub nom. Kontrick v. Ryan*, 540 U.S. 443 (2004).

Parent contends that Gauri ran afoul of § 727(a)(2) when he failed to disclose BD Chicago's receipt of the EIDL proceeds in the June 2020 Monthly Operating Report and transferred those proceeds, also without disclosure, by directing the SBA to disburse them to an account held by BD Petroleum. (Adv. Dkt. 44-1 ¶ 67; Adv. Dkt. 16 ¶¶ 67, 72). Once again, Gauri responds that his receipt and transfer of the EIDL proceeds were recorded in the Operating Subsidiaries' books and records and reflected in financial statements filed with the BD Chicago periodic reports. He also argues that these transfers do not materially relate to the BD Chicago bankruptcy estate and that they benefited creditors of the Operating Subsidiaries and thus could not have been made with the intent to defraud creditors.

### A.   The Act

Parent claims that Gauri committed the "acts" of both "transfer" and "concealment" of BD Chicago's property. The Bankruptcy Code defines "transfer," in relevant part, as "each mode,

18

direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with

. . . property . . . or . . . an interest in property." 11 U.S.C. § 101(54)(D). In turn, concealment, for

purposes of § 727(a)(2), "consists of failing or refusing to divulge information to which creditors

are entitled." *Neary v. Mosher (In re Mosher)*, 417 B.R. 772, 784 (Bankr. N.D. Ill. 2009) (internal

quotations omitted).

In this matter, Gauri both transferred and concealed property in the context of § 727(a)(2).

Pursuant to his instructions in BD Chicago's EIDL application, the SBA wired the EIDL proceeds

directly to an account held by BD Petroleum. This is an "indirect transfer" within the definition of

the Code. *See Carmel v. River Bank America (In re FBN Food Servs., Inc.)*, 175 B.R. 671, 683

(Bankr. N.D. Ill. 1994) ("An example of an indirect transfer is when A has a claim against B, and

instead of B paying A directly for the claim, A directs B to pay C."), *aff'd*, 185 B.R. 265 (N.D. Ill.

1995), *aff'd*, 82 F.3d 1387 (7th Cir. 1996).

As for concealment, Gauri failed not only to disclose the transfer but also to get the Court's

permission before obtaining the loan for BD Chicago and pledging the company's assets as

collateral. Although § 364 allows a debtor in possession under § 1184 to incur certain unsecured

debts in the ordinary course of business without first obtaining court permission, the debtor in

possession has no such discretion with respect to secured debts. 11 U.S.C. §§ 364, 1184. Because

the EIDL loan was secured by the assets of BD Chicago, notice and a hearing were required in

order for Gauri to obtain that loan.[6] Despite this requirement, Gauri filed no motion for authority

to incur this debt and entirely failed to disclose the EIDL loan. The affidavits to which Gauri cites

in support of his claim that the EIDL loan was disclosed refer only to records that were not

---

[6] Local Rule 4001-2(A)(1), applicable during the relevant time, stated that, "[e]xcept as provided in these Rules, all cash collateral and financing requests under §§ 363 and 364 of the Bankruptcy Code must be heard by motion filed pursuant to Fed. R. Bankr. P. 2002, 4001, and 9014 ('Financing Motions').").

available to creditors or the Court. For these reasons, the Court finds that Gauri committed the acts

of "transfer" and "concealment" within the meaning of § 727(a)(2).[7]

### B. Fraudulent Intent

The only remaining question under § 727(a)(2) is whether Gauri intended "to hinder, delay,

or defraud a creditor" when he concealed the EIDL loan and transferred its proceeds. *See* 11 U.S.C.

§ 727(a)(2). The issue of a debtor's intent is a question of fact to be determined by the court. *Smiley*

*v. First Nat'l Bank of Belleville (In re Smiley)*, 864 F.2d 562, 566 (7th Cir. 1989). Because a debtor

is unlikely to admit his fraudulent intent, a finding of actual intent may be inferred from the

surrounding circumstances. *Vill. of San Jose v. McWilliams*, 284 F.3d 785, 790–91 (7th Cir. 2002).

Certain factors, or "badges" of fraud, "may warrant the inference." *See Cohen v. Olbur (In re*

*Olbur)*, 314 B.R. 732, 744 (Bankr. N.D. Ill. 2004). These badges include (1) a lack of consideration

for the transfer; (2) a familial or close relationship between the parties; (3) the debtor's retention

of possession, benefit, or use of property; (4) the debtor's financial condition both before and after

the relevant transaction; and (5) the chronology of the events in question. *Id.* Just one of these

badges is sufficient to establish fraudulent intent, but the presence of several "indicates strongly

that [the] debtor possessed the requisite intent. *See Jeffrey M. Goldberg & Assocs., Ltd. v. Holstein*

*(In re Holstein)*, 299 B.R. 211, 230 (Bankr. N.D. Ill. 2003) (internal quotations omitted), *aff'd*,

2004 WL 2075442 (N.D. Ill. 2004). As discussed *supra*, fraudulent intent may also be established

by demonstrating that the debtor acted with reckless disregard. *Chavin*, 150 F.3d at B.R. at 728.

---

[7] Gauri also contends that BD Chicago was under no duty to report the receipt or transfer of the EIDL proceeds because the EIDL loan was not "related materially to the BD Chicago bankruptcy estate" as (1) it "did not affect the assets and liabilities of that estate," and (2) "none of the statements relating thereto were made in connection with the BD Chicago case." (Adv. Dkt. 47 ¶ 8.) Gauri bases this claim on the notion that BD Chicago was merely a "nominee" for the true borrower, BD Petroleum. That argument was addressed above and will not be revisited here. BD Chicago was the true borrower with respect to the EIDL loan, and BD Chicago's assets were pledged as collateral for that loan.

In this matter, all badges of fraud but the fourth are present, and these multiple badges favor a finding that Gauri intended to hinder, delay, or defraud creditors, including Parent. BD Petroleum provided no consideration for the EIDL proceeds when those funds were transferred by BD Chicago. To the contrary, Gauri has repeatedly asserted that BD Chicago was not a party to the EIDL loan, which, if true, would obviate the need for any consideration. Further, a close relationship existed among Gauri, BD Chicago, and BD Petroleum. Gauri controlled both BD Petroleum and BD Chicago, and BD Chicago controlled BD Petroleum. As a result, BD Chicago unquestionably retained possession, benefit, and use of the funds after their transfer because any benefit to BD Petroleum would have also benefited BD Chicago and Gauri. *See Olbur*, 314 B.R. at 744. Finally, the chronology of events may be the most damaging to Gauri's case. Though he may have initially sought the EIDL loan on behalf of BD Petroleum, Gauri admits that an SBA representative informed him that BD Chicago had to be the named party on the loan under the SBA's rules. (Adv. Dkt. 47 ¶ 19.) Even if Gauri believed that naming BD Chicago on the loan would not affect the terms of the loan, he made no effort to verify the accuracy of that belief. By his own account, Gauri shows himself to have acted with reckless disregard for the truth with respect to which parties were bound by the terms of the EIDL loan.

For all of the reasons above, the Court finds that Gauri acted with fraudulent intent when he concealed the EIDL loan proceeds from the Court and his creditors and transferred them to BD Petroleum. Thus, the elements of § 727(a)(2)(A) are satisfied, and Gauri's discharge will be denied under that statutory provision.

### 4. Section 727(a)(3)

In Count 1 of its complaint, Parent alleges that Gauri's discharge should be denied under § 727(a)(3), which "imposes on the debtor an affirmative duty to create books and records that

21

accurately document his business affairs." *Costello*, 299 B.R. at 897. Specifically, § 727(a)(3) requires the denial of discharge if a debtor "has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case." 11 U.S.C. § 727(a)(3). Intent to defraud is not an element under the statutory provision. *See Costello*, 299 B.R. at 896–97. Simply put, § 727(a)(3) makes complete financial disclosure a "condition precedent to the privilege of discharge." *Peterson v. Scott (In re Scott)*, 172 F.3d 959, 967 (7th Cir. 1999) (internal quotations omitted).

In this matter, Parent claims that Gauri concealed or falsified recorded information related to the EIDL loan, the receipt and disposition of the EIDL proceeds, the PPP loans, and the Southwind Factoring Agreement indebtedness. According to Parent, these disclosures were missing from BD Chicago's disclosure statement, 2015.3 Report, and June 2020 Monthly Operating Report. Although reference is made to these specific documents, Parent need not prove that a violation occurred with respect to each of them. Rather, Parent must show that Gauri concealed or falsified records such that Parent could not "trace [his or BD Chicago's] financial history," "ascertain [their] financial condition," or "reconstruct [their] financial transactions." *Id.* at 969. Adequacy is determined on a case-by-case basis, *Hansen*, 325 B.R. at 761–62, and the Court has broad discretion in determining whether Gauri's records are sufficient to satisfy § 727(a)(3), *see Costello*, 299 B.R. at 897. Among the factors to consider are the size, complexity, and nature of Gauri's business; Gauri's education and sophistication; his business experience and acumen; and his "personal financial structure." *See Hansen*, 325 B.R. at 762 (internal quotation omitted). If Parent can establish inadequacy of Gauri's records, then the burden shifts to Gauri to

22

show that his failure to preserve or produce adequate records was "justified under all of the circumstances of the case." 11 U.S.C. § 727(a)(3); *see also Costello*, 299 B.R. at 897.

The Court notes that the Southwind Factoring Agreement and BD Chicago's 2015.3 Report both came into existence prior to March 22, 2020, when § 727(a)(7)'s lookback period begins. The doctrine of "continuing concealment," however, is applicable in those instances. *See Holstein*, 299 B.R. at 231. That doctrine further extends the reach of § 727(a)(3) to include a concealment that occurred before the start of § 727(a)(7)'s one-year lookback period if Gauri allowed the information "to remain concealed into the critical year." *Id.*

In support of its position, Parent urges the Court to apply findings from its oral ruling denying confirmation of Gauri's chapter 11 plan for bad faith and lack of feasibility to Parent's allegations under § 727(a)(3). (*See* Tr. at 11:17–12:10, 12:21–13:2.) Specifically, Parent refers to the Court's findings that Gauri made misrepresentations to certain financial institutions to obtain the PPP and EIDL loans and that he failed to disclose the Southwind factoring agreement. (*Id.*) Parent argues that the doctrines of issue preclusion and law of the case preserve these findings for consideration in the matter at hand.

As Gauri correctly points out, however, none of these findings was essential to the Court's ultimate holding—that Gauri's plan was unfeasible and proposed in bad faith. Because these statements were not "essential to the final judgment," issue preclusion cannot be applied. *See Herbstein v. Bruetman*, 266 B.R. 676, 683 (N.D. Ill. 2001), *aff'd*, 32 F. App'x 158 (7th Cir. 2002). On the other hand, law of the case is a discretionary doctrine that "embodies the notion that a court ought not to re-visit an earlier ruling in a case absent a compelling reason." *Minch v. City of Chi.*, 486 F.3d 294, 301 (7th Cir. 2007); *see also Flynn v. FCA US LLC*, 39 F.4th 946, 953 (7th Cir.

23

2022) (explaining that application of the law-of-the-case doctrine is left to the court's discretion). Prior determinations of the Court will not be disturbed without cause.

The Court's findings from its prior ruling and the indisputable facts in this matter each independently establish that Gauri failed to disclose the EIDL loan, the PPP loans, and the Southwind Factoring Agreement in the filings cited by Parent above. In fact, Parent specifies every docket entry in which these disclosures conceivably might have been made prior to their discovery. The Court's search of its dockets also failed to yield any of the required disclosures. And, as discussed above, nothing to which Gauri himself cites points to disclosures in the record that would allow the Court or creditors to better ascertain BD Chicago's financial condition.

The missing information is substantial. The EIDL and PPP loans totaled over $550,000, the Southwind Factoring Agreement contained a lien on all of BD Petroleum's assets, and the EIDL loan gave the SBA a direct lien on all of BD Chicago's assets. As BD Chicago was a company with $2 million in annual income and only three Operating Subsidiaries under its control, these are considerable omissions. Because these omissions made it difficult for BD Chicago's financial condition or business transactions to be ascertained, their disclosure was required under § 727(a)(3), and "withholding knowledge or information required by law to be made known" constitutes concealment in violation of that provision. *Scott*, 172 F.3d at 967. Although Gauri failed to disclose the Southwind Factoring Agreement on BD Chicago's 2015.3 Report filed at the end of 2019—before § 727(a)(7)'s lookback period began—that concealment ran well into the lookback period, and thus the doctrine of "continuing concealment" applies. *Holstein*, 299 B.R. at 231.

Gauri believes that BD Chicago had no obligation to report assets, liabilities, and transactions of the Operating Subsidiaries other than as required under Rule 2015.3. However,

excusing Gauri from reporting on such proportionally large debts would be inconsistent with this Court's interpretation of § 727(a)(3), particularly when applied to a holding company like BD Chicago, which entirely depended on its Operating Subsidiaries to generate revenue. The records that Gauri concealed here left both creditors and the Court unaware of agreements affecting value equivalent to roughly half of BD Chicago's reported annual income. That is far too significant to ignore.

The Court acknowledges that § 727(a)(3) is generally not used to bar the discharge of "an ordinary consumer debtor." *Hansen*, 325 B.R. at 762. This matter, however, does not involve such a debtor. Rather, Gauri is an experienced businessman who has over a decade of experience running various sizeable companies. Since 2006, he has overseen the growth of the Black Dog companies, and he represented in the June 2020 Monthly Operating Report that BD Chicago was generating combined annual income of about $2 million per year through the Operating Subsidiaries. Therefore, it is not unreasonable to expect and require him to keep and disclose adequate records of his financial affairs.

In sum, Gauri concealed recorded information from which his and BD Chicago's financial situation and business transactions could be ascertained with any kind of accuracy. He also did not offer any reasonable justification for his failure to disclose that financial information. Accordingly, the Court finds in favor of Parent and against Gauri on Count 1 of the complaint, and Gauri's discharge will be denied pursuant to § 727(a)(3).

### 5. Section 727(a)(6)

In Count 4 of its complaint, Parent objects to Gauri's discharge under § 727(a)(6)(A). That statutory provisions requires the denial of discharge if a debtor "has refused, in the case[,] . . . to obey any lawful order of the court, other than an order to respond to a material question or to

25

testify." 11 U.S.C. § 727(a)(6)(A); *see also Grochocinski v. Eckert (In re Eckert)*, 375 B.R. 474, 480 (Bankr. N.D. Ill. 2007) (explaining that "[e]ffective administration of bankruptcy cases requires debtors to comply completely with lawful orders of the [c]ourt entered in their cases") (internal quotations omitted)), *aff'd*, 2008 WL 4547224 (N.D. Ill. 2008). Specifically, Parent argues that Gauri's discharge should be denied under § 727(a)(6)(A) because he violated the order approving the Case Management Procedures by paying himself and his counsel out of the Operating Subsidiaries' funds.

Courts are split as to whether the word "refused" in § 727(a)(6)(A) requires a finding of intent. *See id.* The term is not defined in the Bankruptcy Code. *Id.* Courts in the minority have held that an action brought under § 727(a)(6)(A) should, "in substance be treated as a civil contempt proceeding," which does not require intent. *Hunter v. Magack (In re Magack)*, 247 B.R. 406, 409–10 (Bankr. N.D. Ohio 1999). Those in the majority, including other courts in this district, have found that the plain meaning of the term "requires the showing of a willful or intentional act as opposed to a mistake or the inability to comply." *Eckert*, 375 B.R. at 480. These courts also emphasize the distinction between "refused" and "failed," which is used elsewhere in § 727(a) and requires no finding of intent. *See, e.g.*, 11 U.S.C. § 727(a)(3); *see also Holstein*, 272 B.R. at 480. The Court agrees with the majority. Accordingly, Parent may meet its burden by showing that Gauri willfully or intentionally failed to comply with the terms of the Case Management Procedures order. *See Eckert*, 375 B.R. at 480. If made, "such a showing [then] imposes [on Gauri] an obligation to explain [his] noncompliance." *See id.*

Parent once again asserts that the question here has already been decided because issue preclusion and law of the case should apply with respect to the Court's ruling denying confirmation of Gauri's chapter 11 plan. In response, Gauri argues that these doctrines are inapplicable, both

26

because the Court made no finding as to Gauri's intent and because any violation was no more than a misunderstanding. On the first point, Gauri is correct. In its ruling on confirmation of Gauri's plan, the Court stated that he "continued to draw funds out of the [Operating Subsidiaries'] businesses and *violate* other provisions of the Case Management Procedures that had been put in place with the trustee." (Tr. at 12:11–15 (emphasis added)). To "violate" is not to "refuse," and the Court assigned no intent in connection with Gauri's violation of the Case Management Procedures order when it denied confirmation of his plan. Because such a determination was not necessary to the Court's holding that the plan was proposed in bad faith, issue preclusion does not apply. *See Herbstein*, 266 B.R. at 683. Nevertheless, the Court did determine that Gauri violated the Case Management Procedures order when he paid himself and his counsel out of the Operating Subsidiaries' funds. Therefore, law of the case applies, and Parent has made a sufficient showing to shift the burden of persuasion to Gauri on this issue. *See Eckert*, 375 B.R. at 480.

To be clear, Parent would have met its burden without reference to the Court's prior ruling. The Case Management Procedures order expressly provides that "absent prior written approval of the Trustee, the Black Dog Companies will not make payments, distributions or transfers of any kind to Amit Gauri, any relatives or affiliates of Amit Gauri or any owners of [BD Chicago]." (BD Chicago Dkt. 347 ¶ 2(e).) Gauri admits that the Operating Subsidiaries made payments to both him and his counsel after entry of the Case Management Procedures order without receiving written approval from the trustee. (Adv. Dkt. 16 ¶ 80; Adv. Dkt. 47 ¶¶ 3, 6.) Whether or not the law-of-the-case doctrine is applied, it is Gauri's obligation to explain his noncompliance.

To do so, Gauri asserts that, although he never got written approval, the trustee verbally advised him that she would "review" his salary and inform counsel for the Operating Subsidiaries "if there was an issue." (Adv. Dkt. 47 ¶ 3.) Gauri further claims that the trustee consented to his

27

salary by consenting to his employment under the Illinois Wage Payment and Collection Act, 820 ILCS 115/4. (*Id.* ¶ 6.) Finally, Gauri emphasizes that he restored the funds to BD Petroleum shortly after the trustee objected to the payment to his attorney. (*Id.* ¶ 5.)

Although the substance of these claims will not be addressed, the Court finds that Gauri has succeeded in raising a genuine issue of material fact regarding his intent. While the trustee says that no salary agreement was ever reached with Gauri prior to payments being made to him, a trial would be needed to determine what took place. Gauri's interpretation of the Illinois Wage Payment and Collection Act and his understanding as to the existence of a handshake agreement with the trustee may be erroneous, but his beliefs are not so "objectively unreasonable" as to preclude the possibility that he held them in good faith. *See Taggart v. Lorenzen*, 587 U.S. 554, 561 (2019); *see also Anderson*, 477 U.S. at 248 (explaining that on summary judgment, the nonmoving party is entitled to the benefit of all reasonable inferences). The same is true for Gauri's belief that paying his attorney was not prohibited by language in the Case Management Procedures order forbidding him from paying any personal "affiliates," especially given the fact that Gauri returned the funds upon the trustee's objection.

Consistent with the analysis above, the Court finds that there is a material factual issue as to whether Gauri willfully or intentionally refused to obey the Case Management Procedures order, and thus entry of summary judgment is inappropriate here. Accordingly, Gauri's discharge will not be denied under § 727(a)(6)(A).

## CONCLUSION

For the foregoing reasons, the Court finds in favor of Parent and against Gauri on Counts 1, 2, and 3 of the complaint. As such, Gauri's discharge will be denied pursuant to §§ 727(a)(2),

28

(a)(3), (a)(4)(A), and (a)(7). Summary judgment is denied as to Count 4. A separate order will be entered consistent with this Memorandum Opinion.

Dated:  **September 30, 2024**                    **ENTERED:**

_____
Janet S. Baer
United States Bankruptcy Judge